IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 3, 2017

# IN RE SKYLAR P.,[1] ET AL.

**Appeal from the Juvenile Court for Bradley County**
**No. J-14-318      Kurt A. Benson, Judge**

_____

## No. E2016-02023-COA-R3-PT

_____

Mother appeals the trial court's decision to terminate her parental rights to two children on the grounds of:  (1) abandonment by failure to provide a suitable home; (2) abandonment by willful failure to provide support; (3) substantial noncompliance with the requirements of the permanency plans; and (4) persistence of conditions that precipitated the children's removal from Mother's custody.  The trial court found by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the children.  We reverse in part and affirm in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court  Reversed in Part and Affirmed in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and KENNY W. ARMSTRONG, JJ., joined.

Emily Beth Brenyas, Chattanooga, Tennessee, for the appellant, Tabitha P.

Herbert H. Slatery, III, Attorney General and Reporter and Rachel Erin Buckley, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1] This Court has a policy of protecting the identity of children in parental rights termination cases by initializing the last names of the parties.

**OPINION**

I. FACTUAL AND PROCEDURAL BACKGROUND

Tabitha P. ("Mother") is the biological mother of Skylar P., born in August 2008, and Tobyn G., born in October 2012 (together with Skylar, "the children"). Tracy P. is Skylar's biological father.[2] Tobyn's biological father is Denver S.[3]

On August 27, 2014, the Tennessee Department of Children's Services ("DCS") received a referral alleging that the children were exposed to drugs. DCS investigated and discovered that Mother and the children were residing in a one-bedroom apartment with Mother's boyfriend, Jeremy A. ("Jeremy"), as well as another couple and their two children. On September 3, 2014, Mother submitted to a drug screen and tested positive for methamphetamine, amphetamine, and marijuana. Jeremy also submitted to a drug screen and tested positive for methamphetamine, amphetamine, ecstasy, and marijuana. Mother admitted that the adults smoked methamphetamine in the home while the children were present, but she required that the children remain in the bedroom while the adults used drugs. Financially, Mother depended on Jeremy's disability check to provide for the children because she was unemployed. The children entered DCS custody on September 5, 2014. On November 20, 2014, the juvenile court adjudicated the children dependent and neglected because Mother was "unable to provide a safe and stable home for the children due to instability and drug use."

Following the removal, DCS developed three permanency plans for the children between 2014 and 2015. The initial permanency plan, developed on September 19, 2014, and ratified by the trial court on September 25, 2014, listed a goal of "Return to Parent." In the second permanency plan, developed June 22, 2015, and ratified on July 9, 2015, DCS amended the permanency plan goals to "Return to Parent" and "Adoption." The third permanency plan, developed on September 2, 2015, and ratified on September 10, 2015, listed the same goals as the second permanency plan. The permanency plans required Mother to (1) obtain an alcohol and drug assessment and follow all recommendations; (2) sign all required releases for DCS to ensure proper case management; (3) submit to random drug screens; (4) refrain from being around those who use or abuse illegal substances; (5) obtain a sponsor through Narcotics Anonymous or Alcoholics Anonymous who has maintained sobriety for at least five years; (6) participate in educational meetings and comply with Skylar's individualized education program ("IEP"); (7) obtain and maintain a stable residence for at least six months; (8) provide DCS with a copy of a lease agreement in Mother's name; (9) provide DCS with a copy of a valid driver's license, proof of car insurance, vehicle registration, or a

---

[2] On September 20, 2016, the trial court terminated Tracy P.'s parental rights. He did not appeal.

[3] Denver S. signed a waiver of interest on June 17, 2015. He is not a party to this appeal.

transportation plan; (10) maintain contact with the family service worker and inform the worker of any change in circumstance within twenty-four hours; (11) provide proof of legal income once obtaining employment or proof of disability income; (12) cooperate with service providers and treatment plans for the children; (13) refrain from displaying any acts of verbal or physical aggression in front of the children; (14) attend couples counseling with Jeremy, follow all recommendations, and provide DCS with documentation of completion; (15) continue medication management and follow recommendations; and (16) request, in writing, an educational assessment for Skylar.

DCS assigned Casie Byers as the case family service worker in September 2014. At trial, Ms. Byers testified that Mother completed an alcohol and drug assessment, submitted to random drug screens, signed all required releases for DCS to ensure proper case management, and attended Skylar's IEP meetings via telephone. Ms. Byers further testified, however, that Mother failed to complete many of the tasks in the permanency plans. Specifically, Mother failed to obtain sponsorship through Narcotics Anonymous or Alcoholics Anonymous, to avoid individuals who used illegal substances, to maintain a stable residence, and to provide a copy of a valid driver's license, vehicle insurance and registration, or a transportation plan.

Ms. Byers testified that DCS assisted Mother in finding a suitable home during the first four months following the children's removal by providing Mother with a list of housing resources and discussing with Mother which options she could afford. According to Ms. Byers, she provided no assistance beyond the list of resources and discussions because Mother always reported that she had made housing arrangements. Ms. Byers testified that, in the two years between the children's removal and trial, Mother changed her residence at least five times. Ms. Byers further stated that each time Mother moved, she failed to notify DCS of her change in circumstance within twenty-four hours, as the permanency plans required. Although Mother lived in at least five different residences, she provided only one lease agreement during the nearly two years the children were in DCS custody.

Ms. Byers testified that Mother and Jeremy had a hostile relationship but that she was unaware of any domestic violence. In order to assist Mother in complying with the permanency plans' requirement concerning couples therapy, Ms. Byers provided Mother with telephone numbers and a list of resources. Mother, however, failed to attend couples counseling with Jeremy.

At trial, Mother testified that she paid child support payments for December 2015 through March 2016. Mother stated that at the time she made the payments, she was working at Hardee's for approximately forty-eight hours per week and was earning $7.75 per hour. According to Mother, the child support payments were garnished from her pay checks every two weeks. Although Mother paid child support payments during this four-month period, she failed to pay child support at other times while the children were in

DCS custody. Consequently, Mother was incarcerated for failure to pay child support. At the time of trial, Mother owed $3,000 in child support arrears. Mother testified that she expected to remain incarcerated until November 23, 2016.

Mother also testified about her residential instability. She admitted to residing in multiple residences after the children entered DCS custody. Mother further admitted that she still associated with individuals who used drugs. Specifically that, prior to her incarceration, she resided with Sheree B., Jeremy's relative, who had failed a hair follicle test. During cross-examination, Mother admitted that she used methamphetamine four to six months before trial.

The children's foster mother, Dana C. ("Foster Mother"), testified that the children had resided with her and her husband for approximately ten months. Foster Mother stated that the children had bonded with her and her husband since entering their home. As support for this statement, Foster Mother testified that she gave the children different options for what they could call her and her husband and told them it was their choice. Foster Mother testified that the children chose to call her and her husband "mom" and "dad." She stated that she and her husband wished to adopt the children if they become available for adoption.

On April 4, 2016, DCS filed its petition to terminate Mother's parental rights. After DCS filed its petition, the children's maternal grandparents filed a petition to intervene, seeking custody of the children. The maternal grandparents had custody of Mother's oldest daughter, who is not at issue in this case. The trial court denied the maternal grandparents' petition in part because they waited until approximately twenty-two months after the children entered DCS custody to file their petition, and because the court had concerns about their health and income.

The trial court heard the case on August 8, 2016. On September 20, 2016, the trial court entered an order terminating Mother's parental rights to the children. The trial court found by clear and convincing evidence that Mother abandoned the children by failing to provide a suitable home, abandoned the children by willful failure to support, failed to substantially comply with the requirements of the permanency plans, and that the conditions which precipitated removal still persisted with little chance those conditions would be remedied at an early date. The trial court also found that it was in the best interest of the children to terminate Mother's parental rights.

On appeal, Mother presents four issues for our review. Those issues can be consolidated into two issues and restated as follows: (1) whether the trial court erred in finding by clear and convincing evidence that grounds existed to terminate Mother's parental rights, and (2) whether the trial court erred in determining that termination of Mother's parental rights was in the best interest of the children.

## II. STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.3d 674, 678 (Tenn. 1994)). This right is not absolute, however. If a compelling state interest exists, the state may interfere with parental rights. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Nale*, 871 S.W.2d at 678). Our legislature has enumerated the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). A parent's rights may be terminated only where a statutory ground exists. *In re Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Because terminating a parent's fundamental parental rights has severe consequences, termination cases require a court to apply a higher standard of proof. *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 761 (Tenn. Ct. App. 2006). Consequently, a court must determine by clear and convincing evidence both that grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted)).

Because of the heightened standard of proof required in termination of parental rights cases, we must adapt the customary standard of review established by Tenn. R. App. P. 13(d). *Id.* In accordance with Tenn. R. App. P. 13(d), we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. *Id.* Next, we must determine whether the facts establish the existence of one or more grounds for termination by clear and convincing evidence. *In re M.J.B.*, 140 S.W.3d at 654.

## III. ANALYSIS

### Grounds for Termination

The trial court terminated Mother's parental rights on four grounds: (1) abandonment by failure to provide a suitable home; (2) abandonment by willful failure to support; (3) substantial noncompliance with the permanency plans; and (4) the conditions that caused the children's removal still persisted. The existence of any one of these statutory grounds will support the termination of Mother's parental rights. *In re Valentine*, 79 S.W.3d at 546.

- 5 -

A. Abandonment by Failure to Provide a Suitable Home

Mother first argues that the trial court erred by finding that DCS proved by clear and convincing evidence that she abandoned the children by failing to provide a suitable home. Tennessee Code Annotated section 36-1-113(g)(1) provides for termination of parental rights based upon the ground of abandonment "as defined in Tenn. Code Ann. § 36-1-102." Several definitions of abandonment appear in Tenn. Code Ann. § 36-1-102(1)(A). Relevant to this argument, Tenn. Code Ann. § 36-1-102(1)(A)(ii) defines abandonment, in pertinent part, as follows:

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; *and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child*, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

(Emphasis added). In order to establish a suitable home, a parent or guardian must provide more than an appropriate physical structure. *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (citing *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A parent or guardian must also provide a home that is "free from drugs and domestic violence." *Id.* (citing *C.W.*, 2007 WL 4207941, at *3).

The trial court found that DCS made reasonable efforts to assist Mother with establishing a suitable home for the children. The trial court also found that Mother made no reasonable efforts to provide a suitable home and that she likely would not be able to provide a suitable home for the children in the immediate future.

As stated above, Tenn. Code Ann. § 36-1-102(1)(A)(ii) specifically requires DCS to make reasonable efforts to assist the parents in establishing a suitable home "for a period of four (4) months following the removal[.]"[4] Here, the children were removed from Mother's home on September 5, 2014. Therefore, the relevant four-month period in this case is September 6, 2014 through January 5, 2015. From the record before us, we cannot conclude that DCS met its burden to demonstrate that it made reasonable efforts to assist Mother with housing during the relevant statutory period. Specifically, there is no evidence in the record to suggest that DCS made any effort to assist Mother with housing beyond providing her with a list of housing resources and discussing with her the options she could afford. We have previously held that DCS must do more than simply provide parents with a list of housing resources to prove that it made reasonable efforts to assist with housing. *In re Isobel V.O.*, No. M2012-00150-COA-R3-PT, 2012 WL 5471423, at *9 (Tenn. Ct. App. Nov. 8, 2012). At trial, Ms. Byers testified that she did not provide further assistance because Mother "always seemed to have a place that she was getting ready to move into." Ms. Byers, however, admitted on cross-examination that she never confirmed that Mother had a home she was preparing to move into because Ms. Byers "just took [Mother's] word for it for the most part . . . ."

Mother argues that DCS should have done more to assist her in establishing a suitable home despite the fact that she repeatedly told Ms. Byers she was preparing to move into housing because DCS was aware that Mother had mental health issues. DCS asserts that Mother has waived this argument because she did not raise it at trial. DCS is correct that issues not raised at trial are generally considered waived on appeal. *See Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983) ("It has long been the general rule that questions not raised in the trial court will not be entertained on appeal."). There is, however, an exception to this general rule. The Tennessee Supreme Court recently stated that:

> Rules 13(b) and 36(a) of the Tennessee Rules of Appellate Procedure, considered together, give appellate courts considerable discretion to consider issues that have not been properly presented in order to achieve fairness and justice. *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 916 (Tenn. Ct. App. 2000) (citing *Aaron v. Aaron*, 909 S.W.2d 408, 412 (Tenn. 1995)). "Taken together, these rules permit appellate courts to grant complete relief to the parties as long as they have been given fair notice and an opportunity to be heard on the dispositive issues." *Id.* (citing

---

[4] The Tennessee Supreme Court has overruled the line of cases that "required DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights." *In re Kaliyah S.*, 455 S.W.3d 533, 555 n.34 (Tenn. 2015). The Court's holding in that case does not negate DCS's obligation to make reasonable efforts to assist a parent in establishing a suitable home as required by Tenn. Code Ann. § 36-1-102(1)(A)(ii). *In re Yariel S.*, No. E2016-00937-COA-R3-PT, 2017 WL 65469, at *6 n.3 (Tenn. Ct. App. Jan. 6, 2017).

*Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 608 (Tenn. Ct. App. 1999)).[5]

*In re Kaliyah S.*, 455 S.W.3d at 540 (footnote omitted). In this case, we exercise our discretion to address Mother's argument regarding her mental health so as to achieve fairness and justice.

Examination of the record reveals that DCS knew shortly after the children entered DCS custody that Mother had Attention Deficit Hyperactivity Disorder ("ADHD") and Bipolar Disorder. Specifically, DCS included Mother's ADHD and Bipolar Disorder as a concern in the initial permanency plan. Each subsequent permanency plan included Mother's ADHD and Bipolar Disorder as a listed concern and required her to continue medication management and follow all recommendations. At trial, however, DCS presented no evidence to show that it provided any services to facilitate Mother's mental health treatment. Indeed, at no point during trial did DCS present any evidence demonstrating that it looked into the nature of Mother's mental health issues or considered how her mental health issues may have contributed to her substance abuse or inability to secure stable housing. Mother repeatedly reported to DCS that she was close to finding suitable housing. Despite knowing Mother had mental health issues, however, DCS continued to accept "her word for it" and offered no assistance beyond providing a list of resources and discussions. Thus, we conclude that the evidence preponderates against the trial court's finding that DCS expended reasonable efforts to assist Mother in establishing suitable housing during the statutory period. We, therefore, hold that DCS failed to prove by clear and convincing evidence the existence of the ground of abandonment by failure to provide a suitable home.

### B. Abandonment by Failure to Support

Mother next argues that the trial court erred by finding DCS proved by clear and convincing evidence that she abandoned the children by willfully failing to make

---

[5] Tennessee Rule of Appellate Procedure 13(b) provides:

> Review generally will extend only to those issues presented for review. The appellate court shall also consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review, and may in its discretion consider other issues in order, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process.

Tennessee Rule of Appellate Procedure 36(a) provides:

> [An appellate court] shall grant the relief on the law and facts to which the party is entitled or the proceeding otherwise requires and may grant any relief . . .; provided, however, relief may not be granted in contravention of the province of the trier of fact.

reasonable support payments during the four months prior to DCS filing the petition to terminate her parental rights. On appeal, DCS elected not to defend this ground for termination.

As we previously mentioned, Tenn. Code Ann. § 36-1-113(g)(1) provides for the termination of parental rights based upon the ground of abandonment "as defined in § 36-1-102." Relevant to this argument, Tenn. Code Ann. § 36-1-102(1)(A)(i) defines abandonment, as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have . . . willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Whether a parent failed to support his or her child presents a question of fact. *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013). Whether a parent's failure to support constitutes willful abandonment, however, presents a question of law. *Id.*

A parent's failure to support a child constitutes "willful" conduct when he or she "is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (citing *In re M.J.B.*, 140 S.W.3d at 654). A parent's intent determines whether a particular conduct is "willful." *Id.* Because intent can rarely be proven by direct evidence, the trier-of-fact infers intent from a parent's actions or conduct. *Id.* In this case, the relevant four-month time period is December 11, 2015 through April 10, 2016. Mother testified that she made child support payments between December 2015 and March 2016 because the payments were garnished from her paychecks every two weeks. The record includes a child support payment summary showing that Mother made child support payments for January through March 2016. Accordingly, we conclude that the evidence preponderates against a finding that Mother failed to support the children during the four months prior to DCS filing its petition to terminate her parental rights. We reverse the trial court's termination of Mother's parental rights based upon the ground of abandonment by willful failure to support.

## C. Substantial Noncompliance

Mother next contends that the trial court erred by finding that DCS proved by clear and convincing evidence that she was substantially noncompliant with the permanency plans and that the conditions precipitating removal still persisted. Mother combined the two grounds of substantial noncompliance and persistence of conditions in her brief, but

we will address each ground separately. We begin with the ground of substantial noncompliance with the permanency plans.

Tennessee Code Annotated section 36-1-113(g)(2) provides for the termination of parental rights when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]" The fact that a parent is noncompliant with a permanency plan is not sufficient to terminate parental rights. *In re Valentine*, 79 S.W.3d at 548. Rather, a parent's noncompliance with a permanency plan "must be substantial." *Id.* Substantial noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* Whether a parent is substantially noncompliant with a permanency plan is a question of law. *Id.*

When determining whether a parent has failed to substantially comply with the requirements of a permanency plan, a trial court must find that the requirements "'are reasonable and related to remedying the conditions which necessitate foster care placement.'" *Id.* at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). In this case, the trial court found that the requirements of the permanency plans were reasonable and related to remedying the conditions that caused the children's removal from Mother's home.

In the nearly two years between the children's removal and trial, Mother complied with the requirements of completing an alcohol and drug assessment, submitting to random drug screens, and attending Skylar's IEP meetings. Despite her compliance with these requirements, however, Mother admitted during cross-examination that she had used methamphetamine between four and six months prior to trial. She complied with the requirement of providing proof of legal income when she began working at McDonald's, where she worked for one month. When Mother began working at Hardee's, however, she failed to provide DCS with proof of her employment. Further, Mother failed to comply with the requirements of providing DCS with a copy of a lease agreement in her name and maintaining residential stability for six months. Additionally, she failed to comply with the requirements of obtaining sponsorship through Narcotics Anonymous or Alcoholics Anonymous, attending couples counseling with Jeremy, and following all recommendations. We conclude that this proof establishes by clear and convincing evidence substantial noncompliance with the requirements of the permanency plans. Thus, we hold that the trial court did not err by relying on this ground for termination of Mother's parental rights.

We note that Mother asserts the trial court erred in finding clear and convincing evidence of substantial noncompliance with the permanency plans because DCS should have done more than provide her with a list of resources to assist her in complying with the requirements of the permanency plans, especially in light of her mental health issues. Although Mother's brief does not directly state that DCS failed to expend reasonable

efforts to assist her in complying with the permanency plans, a thorough examination of that section of her brief indicates that is the argument she presents. The termination statute regarding the ground of substantial noncompliance with the requirements of a permanency plan contains no requirement that DCS expend reasonable efforts to assist a parent in complying with the permanency plan requirements. *See* Tenn. Code Ann. § 36-1-113(g)(2). Additionally, the Tennessee Supreme Court has stated the following:

> [T]he extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent. As with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. *In re Audrey S.*, 182 S.W.3d at 861.

*In re Kaliyah S.*, 455 S.W.3d at 555. Accordingly, DCS is not required to prove it made reasonable efforts to assist Mother in complying with the requirements of the permanency plans for the trial court to terminate Mother's parental rights based upon the ground of substantial noncompliance. We will weigh DCS's efforts to assist Mother in the best-interest analysis section.

D. Persistence of Conditions

Tennessee Code Annotated section 36-1-113(g)(3) authorizes termination of parental rights when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or a guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

The record reflects that the children were removed from Mother's custody on September 5, 2014 due to Mother exposing the children to drugs. On November 20, 2014, the juvenile court adjudicated the children dependent and neglected due to Mother's drug use and failure to provide a safe and stable home for them. DCS filed the petition to terminate Mother's parental rights on April 22, 2016, approximately nineteen months after the children entered DCS custody. Thus, the six-month requirement was satisfied.

At the time DCS became involved with the family, Mother, the children, and Jeremy resided in a one-bedroom apartment together with another couple and their children. Mother lived in a minimum of five different residences following the children's removal. Despite residing in at least five different residences during the nearly two years prior to trial, Mother only provided DCS with one lease agreement, but she moved from that residence shortly thereafter. Mother still had not secured a safe and stable home for the children by the time of trial. Furthermore, on two occasions, Mother resided with Sheree B., who failed a hair follicle test shortly after the children entered DCS custody.

In addition to Mother's continuing inability to secure a safe and stable home for the children, she was unsuccessful in completely removing drugs from her life. Mother completed an alcohol and drug assessment and submitted to random drug screens; however, she admitted to using methamphetamine four to six months prior to trial. Mother also continued to surround herself with other drug users. Ms. Byers testified that Mother admitted that she continued to spend time with persons who smoked marijuana. Additionally, Mother failed to obtain sponsorship through Narcotics Anonymous or Alcoholics Anonymous. This evidence supports the trial court's finding that the conditions that led to the children's removal still persisted and that there was little likelihood that the conditions that led to the children's removal would be remedied at any early date. Tenn. Code Ann. § 36-1-113(g)(3)(A) & (B).

DCS placed the children in a pre-adoptive foster home approximately ten months prior to trial. The children refer to the foster parents as "mom" and "dad." Furthermore, the children refer to the foster parents' parents as "grandparents." Ms. Byers testified that she observed the foster parents and the children display affection between each other and bond through playing. Foster Mother testified that she and her husband would like to adopt the children if they become available for adoption. Therefore, a continuation of Mother's parental rights would negatively affect the "[children's] chances of early integration into a safe, stable and permanent home." Tenn. Code Ann. § 36-1-113(g)(3)(C). After a thorough examination of the record, we conclude that DCS proved the persistence of conditions ground by clear and convincing evidence and that the trial court did not err in terminating Mother's parental rights based on this ground.

<u>Best Interest of the Child</u>

Having determined that clear and convincing evidence of two statutory grounds exists to terminate Mother's parental rights, we must next consider whether the trial court properly determined that termination is in the children's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878.

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court is to consider the following non-exclusive factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).

The trial court made the following findings of fact when determining it was in the best interest of the children to terminate Mother's parental rights:

It is in the children's best interests for termination to be granted, because [Mother] has not made changes in her conduct or circumstances that would make it safe for the children to go home.
. . . .

It is in the children's best interests for termination to be granted as to [Mother], because she has not made lasting changes in her lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible.
. . . .

It is in the children's best interests for termination to be granted against [Mother], because changing caregivers at this stage of their lives will have a detrimental effect on them.
. . . .

It is in the children's best interests for termination to be granted, because [Mother] has not paid child support consistently.

The evidence at trial makes it clear that Mother has struggled to improve her circumstances so as to make it safe for the children to return to her custody. Mother changed residences a minimum of five times between the children's removal and trial. DCS provided Mother with a list of housing resources and discussed with her the options available based on Mother's budget. DCS made no further efforts to assist Mother in establishing a suitable home, however. Despite being aware of Mother's ADHD and Bipolar Disorder as early as the first permanency plan, DCS provided Mother with no assistance in addressing her mental health issues. In addition to failing to establish a suitable home for the children, Mother has failed to remove drugs from her life.

Although she completed an alcohol and drug assessment, she admitted to using methamphetamine four to six months prior to trial. Moreover, she continues to associate with other individuals who use drugs.

During the four-month period prior to DCS filing the petition to terminate Mother's parental rights, Mother made several child support payments. Despite working at McDonald's and Hardee's, Mother made only eight child support payments following the children's removal from her custody. She allowed her child support arrearage amount to accrue to such a high level that she was arrested and found to be in contempt for her failure to pay. At the time of trial, she owed more than $3,000 in child support arrears.

The record indicates the children have done well in their pre-adoptive foster home. Foster Mother testified that the children have bonded well with her and her husband. In fact, the children refer to her and her husband as "mom" and "dad." Foster Mother stated that she and her husband wish to adopt the children if they become available for adoption.

Mother argues that termination of her parental rights is not in the best interest of the children because it would sever the children's ties to their maternal grandparents and older sister. We do not discount the importance of the relationship between the children and their maternal grandparents and older sister. The children, however, have been in DCS custody for more than two years while Mother failed to improve her circumstances. The children should be allowed to continue to thrive in their pre-adoptive placement with foster parents with whom the children have bonded and who would like to adopt the children. After thorough examination of the record, we conclude that there is clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the children.

IV. CONCLUSION

We affirm the trial court's decision terminating Mother's parental rights based on the grounds of substantial noncompliance and persistence of conditions. We reverse the trial court's decision terminating Mother's parental rights based on the grounds of abandonment by failure to provide a suitable home and abandonment by willful failure to support. We affirm the trial court's conclusion that it is in the best interest of the children to terminate Mother's parental rights, and thus, affirm the trial court's ultimate decision to terminate Mother's parental rights to the children. Costs of this appeal are assessed against the appellant, Tabitha P., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE